**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 1018272)
Stephen A. Beck (State Bar No. 1010183)
Kevin A. Kapral (State Bar No. 1068669)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
Email: swestcot@bursor.com
sbeck@bursor.com
kkapral@bursor.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GREEN SENTRY HOLDINGS, LLC d/b/a SUNBURN CANNABIS,<br><br>Defendant. | Civil Action No.: 9:26-cv-80051-EA<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Doe[1] ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Green Sentry Holdings, LLC d/b/a Sunburn Cannabis ("Sunburn Cannabis" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

[1] After effectuating service, Plaintiff intends to file a motion to proceed pseudonymously.

## NATURE OF THE ACTION

1. This is a class action brought on behalf of all persons who purchased medical cannabis on www.sunburncannabis.com (the "Website").

2. Defendant Sunburn Cannabis owns and operates the Website, one of the largest online dispensaries for medical marijuana. Defendant possesses a license from the State of Florida designating it as a recognized medical marijuana treatment center.

3. Defendant's products and services are only available to individuals who possess a Florida medical marijuana card. Cards are only administered to adult individuals who have been medically "[d]iagnosed with a qualifying condition or a comparable chronic condition."[2]

4. However, in the pursuit of profit and to the detriment of patient privacy, Defendant aids, employs, agrees, and conspires with third parties, including Google LLC ("Google"), to intercept patients' communications as they seek medical marijuana products for purchase on its Website. This is because Defendant has surreptitiously installed the Google Analytics Pixel on the Website. This technology is intentionally installed to track and disclose patient activity on Defendant's Website, in real time, to third parties.

5. Confidentiality is paramount to the health and pharmaceutical industries. Respecting a patient's decision to exercise their autonomy in providing personal and sensitive details about their health is vital in building trust with their clinicians.

6. When a patient seeks to purchase medical marijuana, they are entitled to the same legal protections afforded to patients seeking other prescription medications. Furthermore, when

[2] *How to Get a Medical Marijuana Card in Florida*, MMTC, https://www.mmtcfl.com/florida-medical-marijuana-card/.

patients possess confidence that their information is secure, they are more likely to seek important treatment for their underlying health conditions.

7. Numerous federal and state laws impose a legal obligation on Defendant to keep health information about marijuana usage and consumption—including details about marijuana treatments or prescriptions—strictly confidential. See, e.g., 45 CFR § 164.508(a)(1) (regulations pursuant to HIPAA prohibiting covered entities from "us[ing] or disclos[ing] protected health information without an authorization"); Fla. Stat. § 381.986(10)(f)(4) (prohibiting "medical marijuana treatment centers" from "disclosing personal and confidential information of the qualified patient"); Fla. Stat. § 817.568(2)(a) (prohibiting individuals and entities from "fraudulently us[ing], or possess[ing] with intent to fraudulently use, personal identification information concerning another person"); Fla. Stat. § 817.5685 (prohibiting individuals and entities from "intentionally or knowingly possess[ing] … the personal identification information of another person"—including the "medical records" of that person—"without authorization").

8. In violation of these serious regulatory obligations, Defendant is involved in an illicit scheme whereby it has surreptitiously integrated code into its website that discloses protected health information to third-party marketers and data brokers—which, in turn, use that protected information to assist Defendant with marketing campaigns to its customers. Specifically, Defendant aids, employs, agrees with, and conspires with Google to eavesdrop on and disclose electronic communications sent and received by Plaintiff and Class members, including communications that contain sensitive, protected, and confidential information relating to medical marijuana obtainment and usage.

9. By assisting a third party, like Google, with intercepting sensitive and confidential communications, Defendant violated state and federal anti-wiretapping laws—along with HIPAA and other state laws prohibiting marijuana treatment centers from disclosing such information.

10. Plaintiff brings this action for legal and equitable remedies resulting from these illicit actions.

## PARTIES

11. Plaintiff is domiciled in Panama City, Florida. On or around June 1, 2025, Plaintiff visited www.sunburncannabis.com and purchased medical marijuana. After adding his medication to his cart, Plaintiff navigated to the checkout page and entered his full name, phone number, email address, home address, and billing address. At no point during the transaction was Plaintiff put on notice of a terms of service or privacy policy. During Plaintiff's visit to the Website, Defendant assisted a third party—Google—with intercepting his electronic communications made while Plaintiff was navigating the site without Plaintiff's knowledge or consent. These communications contained protected health information ("PHI") and personally identifiable information ("PII"). Knowing that Defendant was statutorily required to safeguard his PHI and PII from disclosure, Plaintiff reasonably expected that his communications revealing such information would remain confidential.

12. At all relevant times, Plaintiff navigated the Website while being physically present in Florida. Moreover, Plaintiff possessed an active Google account.

13. Defendant is a Florida limited liability company headquartered in West Palm Beach, Florida. Defendant develops, owns, and operates the Website. The Website allows patients to browse and purchase medicinal cannabis products online. Such products include, but are not limited to, marijuana flower, rosin concentrate, vape cartridges, edibles, and pre-rolls. Once an

order is placed, patients may pick up their medical marijuana at one of 15 brick and mortar store locations throughout the state.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under a law of the United States—the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because Plaintiff's state claims are so related that they form the same case or controversy. Further, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 members of the putative class, and at least one member of the proposed class is a citizen of a different state than Defendant.

15. This Court has personal jurisdiction over Defendant because Defendant resides in this state and conducts substantial business in the State of Florida.

16. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant resides in this judicial district.

## FACTUAL ALLEGATIONS

### A. The Wiretap Act and the Florida Security of Communications Act

17. "In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which deals with wiretapping and other forms of electronic surveillance." *Scott v. United States*, 436 U.S. 128, 130 (1978). Known today as the Wiretap Act, the statute remains "the primary law protecting the security and privacy of business and personal communications." S. Rep. 99-541 at *3.

18. As originally enacted, the Wiretap Act only extended to surveillance techniques in which "the contents of a communication [could] be overheard and understood by the human ear." S. Rep. 99-5441, at *2. Put differently, Congress "specifically excluded the [electronic] transmission of data from protection against private and governmental interceptions." H.R. 99-647, at *22. Less than two decades later, technological advancements forced Congress to expand the Wiretap Act's ambit:

> In the intervening years, data transmission and computer systems have become a pervasive part of the business and home environments. … Some of these new services permit an individual to use a keyboard and telephone to transmit electronic messages and data and to receive interactive services featuring banking and other financial services, shopping, news, messages and education. Many of these services also record the nature of the transactions engaged in by the user. Thus, the new technologies represent both an explosion in communication opportunities as well as surveillance possibilities. *Id.*

19. In 1986, Congress sought to address these "dramatic changes in new computer and telecommunications technologies" by "amend[ing] title III of the Omnibus Crime Control Safe Streets Act of 1968—the Federal wiretap law—to protect against the unauthorized interception of electronic communications." S. Rep. 99-5441 at *1.

20. Today, the Wiretap Act provides that "any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication … shall be punished … or shall be subject to suit." 18 U.S.C. § 2511. The term "electronic communication" broadly encompasses "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12). That includes, for example, "computer-to-computer communications," like "the transmission of financial records or funds transfers from financial

institutions, medical records between hospitals and/or physicians' offices, and the transmission of proprietary data among the various offices of a company." S. Rep. 99-541 at *3.

21. Contemporaneous with Congress enacting of the Wiretap Act, state legislatures enacted their own prohibitions against eavesdropping on communications. In 1969, for example, the Florida legislature enacted its own anti-wiretapping statute—the Florida Security of Communications Act ("FSCA")—to "safeguard the privacy of innocent persons." Fla. Stat. § 934.01(4). Like the Wiretap Act, the FSCA prohibits intercepting "electronic communications." *See*, e.g., Fla. Stat. § 934.03(1)(a). The FSCA also prohibits "procur[ing] any other person" to effectuate such interceptions. *See, e.g.*, Fla. Stat. § 934.03(1)(a); 18 U.S.C. § 2511(1)(a) (same).

22. Though largely coextensive with the Wiretap Act, the FSCA is a two-party consent statute, meaning that "all of the parties to the communication" must provide "prior consent to such interception." *See* Fla. Stat. § 934.03(3)(d).

**B. Medical Marijuana Usage is Sensitive and Confidential Information**

23. In November 2016, "Florida became the first state in the U.S. south to legalize the use of medical marijuana to treat a variety of health conditions including chronic pain, epilepsy, and spasticity symptoms from multiple sclerosis."[3] Under Florida law, physicians cannot issue a prescription for medical marijuana without diagnosing the patient "with at least one qualifying medical condition" and conducting "an in-person physical examination." *See* Fla. Stat. § 381.986(4)(a). Once issued, patients must then visit a licensed "medical marijuana treatment center" to fill their prescriptions. *See* Fla. Stat. § 381.986(8).

24. Florida law continues to prohibit possession of cannabis without a prescription.

---

[3] https://pmc.ncbi.nlm.nih.gov/articles/PMC6936729/.

25. The usage of medical marijuana is a hot button issue. In 2024, Florida voters overwhelmingly rejected a proposed constitutional amendment to legalize marijuana for recreational use by a nearly ten point margin.[4]

26. As evinced through numerous statutes and regulations, medical marijuana usage and treatment constitute sensitive and confidential information.

27. Sunburn Cannabis operates in Florida as a licensed medical marijuana center.[5]

The approved medical marijuana treatment centers are:

| Name | Phone | Email | Authorization Status | License Number |
|---|---|---|---|---|
| Ayr Cannabis Dispensary | 833-254-4877 | Info@LibertyHealthSciences.com | Dispensing Authorization | MMTC-2015-0002 |
| Cookies Florida | n/a | CookiesFloridaCompliance@Cookiesre.com | Dispensing Authorization | MMTC-2019-0018 |
| Curaleaf | 877-303-0741 | Info.FL@Curaleaf.com | Dispensing Authorization | MMTC-2015-0001 |
| Eden Florida, LLC | 352-508-5725 | Support@EdenFlorida.com | Dispensing Authorization | MMTC-2023-0025 |
| Fino Cannabis | 941-216-5778 | Info@LiveFino.com | Dispensing Authorization | MMTC-2016-0006 |
| FLUENT | 833-735-8368 | Info@GetFluent.com | Dispensing Authorization | MMTC-2015-0003 |
| Goldflower Cannabis | n/a | n/a | Dispensing Authorization | MMTC-2019-0019 |
| Green Dragon | 720-600-9555 | Support@GreenDragon.com | Dispensing Authorization | MMTC-2019-0021 |
| GrowHealthy | 863-223-8882 | Info@GrowHealthy.com | Dispensing Authorization | MMTC-2016-0007 |
| GTI (Rise Dispensaries) | 305-306-8772 | FLInfo@GTIGrows.com | Dispensing Authorization | MMTC-2017-0013 |
| Henry Crusaw | n/a | n/a | Initial Licensure | MMTC-2024-0027 |
| Insa - Cannabis for Real Life | 413-200-5100 | Pat@MyInsa.com | Dispensing Authorization | MMTC-2019-0016 |
| Jungle Boys | n/a | n/a | Dispensing Authorization | MMTC-2019-0015 |
| Leola Robinson | n/a | n/a | Initial Licensure | MMTC-2024-0026 |
| Mint Cannabis *(formerly Cannabist)* | 800-714-9215 | Info@Col-CareFL.com | Dispensing Authorization | MMTC-2017-0011 |
| Moton Hopkins Jr. | n/a | n/a | Initial Licensure | MMTC-2025-0028 |
| MÜV | 833-880-5420 | Support@MUVBrand.com | Dispensing Authorization | MMTC-2017-0010 |
| One Plant Cannabis | n/a | n/a | Dispensing Authorization | MMTC-2018-0014 |
| Planet 13 Florida Cannabis for the Planet | 800-977-1686 | Info@VidaCann.com | Dispensing Authorization | MMTC-2017-0009 |
| Prosperity Medical, LLC | n/a | n/a | Dispensing Authorization | MMTC-2023-0023 |
| Revolution Florida | n/a | n/a | Dispensing Authorization | MMTC-2019-0022 |
| Sanctuary Cannabis | n/a | n/a | Dispensing Authorization | MMTC-2019-0017 |
| Sunburn | 786-288-3145 | Info.FLDelivery@MedMen.com | Dispensing Authorization | MMTC-2017-0012 |

Figure 1

28. Medical marijuana treatment centers "cultivate, process, transport, and dispense marijuana for medical use," and they serve as the exclusive source for patients to lawfully fill a cannabis prescription. *See* Fla. Stat. § 381.986(8)(e).

[4] https://ballotpedia.org/Florida_Amendment_3,_Marijuana_Legalization_Initiative_(2024).

[5] https://knowthefactsmmj.com/mmtc/.

29. Florida law prohibits "a medical marijuana treatment center" from "disclosing personal and confidential information of the qualified patient." *See* Fla. Stat. § 381.986(10)(f)(4). Moreover, the Florida Constitution imposes an affirmative duty on the Department of Health to "protect the confidentiality of all qualifying patients." *See* Fla. Const. Art. XI, § 3(4). As part of that duty, the Department of Health has promulgated regulations requiring "medical marijuana treatment centers" to demonstrate "[e]xperience with handling confidential information" and compliance with "[t]he Health Insurance Portability and Accountability," including "[a] HIPAA complaint computer network."[6]

30. Defendant, through the Google Analytics Pixel, disclosed information that is sensitive, confidential, and personally identifiable to Google.

31. Defendant owns and operates the Website, where its customers can purchase medical marijuana.

32. Under federal law, healthcare providers may not disclose PII or PHI without the patient's express written authorization.[7] In this case, PHI includes, but is not necessarily limited to, medical purchase information.

33. The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule ("Privacy Rule"), to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[8]

---

[6] *Id.*

[7] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[8] U.S. DEPT. OF HEALTH & HUM. SERVS., THE HIPAA PRIVACY RULE, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

34. In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), making business associates of HIPAA covered entities directly liable for compliance with certain requirements of the Privacy Rule.[9] Those requirements include the impermissible uses and disclosures of PHI.[10]

35. A healthcare provider or business associate violates the Privacy Rule if it knowingly and in violation of 42 U.S.C. § 1320d-6(a): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[11]

36. The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

37. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant because it knowingly discloses the individually identifiable health information of its patients.

38. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

---

[9] American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat 115; *see also* 42 U.S.C. § 17931(b) (applying civil and criminal penalties to business associates for violations of 42 U.S.C. § 1320d-6).

[10] U.S. DEPT. OF HEALTH & HUM. SERVS., DIRECT LIABILITY OF BUSINESS ASSOCIATES, https://hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/factsheet/index.html.

[11] 42 U.S.C. § 1320d-6.

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C. Section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

e. Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

39. Health care organizations regulated by HIPAA, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors (as shown below). As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to

> tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.**[12]

40. The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[13]

41. Plaintiff and Class Members face the same risks the government has expressed concern over. Defendant's violative conduct facilitates third-party interception of PHI when Plaintiff and Class Members make medical purchases on Defendant's Website.

42. The Bulletin goes on to further emphasize the breadth of the government's view on patient information. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well **as an individual's IP address** or **geographic location**, medical device IDs**, or any unique identifying code.**[14]

---

[12] U.S. DEPT. OF HEALTH & HUM. SERVS., USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin") (emphasis added), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[13] *Id.* (emphasis added).

[14] *Id.* (emphasis added).

43. The Bulletin continues:

> **All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI**, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as **IP address** or **geographic location**, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care. [15]

44. In July of 2022, the Federal Trade Commission ("FTC") and the HHS issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies

[15] *Id.* (emphasis added).

> gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.
>
> In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, **medications**, **medical treatments,** frequency of visits to health care professionals**, and where an individual seeks medical treatment.**[16]

45. The FTC is unequivocal in its stance. Healthcare companies, like Defendant, have been informed that they should not use tracking technologies to collect sensitive health information and subsequently disclose this information to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.
>
> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.
> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[17]

46. As these regulatory definitions make clear, medical marijuana treatment centers—like Sunburn Cannabis—constitute "covered entities" that must comply with HIPAA.

---

[16] FED. TRADE COMM'N, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Jul. 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (emphasis added).

[17] FED. TRADE COMM'N, COLLECTING, USING, OR SHARING CONSUMER HEALTH INFORMATION? LOOK TO HIPAA, THE FTC ACT, AND THE HEALTH BREACH NOTIFICATION RULE, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach.

47. The industry standard is to treat information concerning medical cannabis treatment and usage as confidential and protected by HIPAA. In Florida and elsewhere, companies recognize precisely as much and assuage consumers that such information is confidential:

- "[M]edical marijuana treatment centers are only permitted to disclose patient information to the patient or their designated caregiver, or as necessary to protect the patient's medical marijuana orders."[18]
- "In Florida, the confidentiality of medical marijuana cardholders is a serious matter, protected under both federal law and state statutes."[19]
- "In the US, medical cannabis confidentiality is protected under the Health Insurance Portability and Accountability Act (HIPAA)."[20]
- "Doctors specializing in medical cannabis cannot release any information without the patient's explicit written consent."[21]
- "Yes, medical marijuana patient privacy is protected under HIPAA."[22]
- "Like any medical records, patients expect their medial marijuana records to remain private to secure their personal information and medical history."[23]

[18] https://flmmd.com/docs/is-my-information-public-or-shared-with-anyone/.

[19] https://www.arcannabisclinic.com/post/does-a-medical-marijuana-card-show-up-on-a-background-check-florida.

[20] https://docmj.com/medical-marijuana-recommendations-confidential/.

[21] https://www.chwmedicalmarijuana.com/medical-marijuana/mmj-privacy/.

[22] https://www.veriheal.com/blog/protecting-your-privacy-hipaa-and-medical-cannabis/.

[23] https://www.cannamd.com/are-my-medical-marijuana-records-private/.

- "HIPAA regulations apply to medical marijuana records, and additional legislation has been put into place to protect the privacy of medical marijuana patients."[24]

48. Put together, like every other health organization, federal and state laws require medical marijuana treatments centers to keep information about patients and treatments confidential. As a corollary, Plaintiff reasonably expected that his electronic communications with Defendant would remain confidential. Despite that reasonable expectation, Defendant systematically discloses such information to third parties.

49. Defendant's conduct, as described herein, directly conflicts with federal law and the clear pronouncements by the FTC and HHS.

**C. Overview of Tracking Technologies**

50. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

51. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

52. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

---

[24] https://www.cannamd.com/are-my-medical-marijuana-records-private/.

**<u>HTTP Request</u>**: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

**<u>Cookies</u>**: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

**<u>HTTP Response</u>**: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

53. A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

54. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

55. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the

web browser's user. The tracking technology embedded on the Website by Defendant constitutes Source Code and functions in a substantially similar way.

### D. The Google Analytics Pixel

56. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

57. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[25] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

Table 1: Google's Revenue

58. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google

[25] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

59. One of these analytics products is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

60. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

61. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

62. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

63. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[26] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[27]

64. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages users visit and what users click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website. The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

65. Once Google's software code collects the data, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

66. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users

---

[26] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.

[27] *Id.*

arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

67. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

68. Google Analytics links with Google Ads, so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[28] Such practices were in effect on Defendant's Website at all relevant times.

69. The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the specific product being purchased by the consumer. Google also received additional PII, including the patients' IP address, device information, and User-IDs.

70. Google collects vast quantities of consumer data through its tracking technology.

71. Due to the vast network of consumer information held by Google, it can match IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

72. Google then utilizes such information through targeted advertising.

---

[28] *Connect Google Ads to Google Analytics*, GOOGLE, https://support.google.com/analytics/answer/9379420?hl=en.

73. Information from websites, like Defendant's, is central to Google's ability to successfully market their advertising capabilities to future clients.

74. In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

75. Google views and processes every piece of information collected from the Google Analytics tracking technology, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

76. Google partners with Defendant in its marketing efforts. Google Analytics tracking technology is employed on the Website in the manner described throughout this Complaint.

**E. Defendant's Unauthorized Disclosures of Protected Information to Google**

77. Google is the largest online advertising company on the planet.[29]

78. Defendant knowingly integrated code from Google into its website to use services—including but not limited to Google Analytics—to augment its advertising and analytics efforts by capturing the content of patients' electronic communications and linking those communications to patients' personally identifiable information.

79. When consumers access and navigate sunburncannabis.com, the Google software script that Defendant embedded on its website surreptitiously directs the user's browser to send a separate message to Google's servers. This second, secret transmission contains the original GET request sent to the host website along with additional data that Google's code is configured to collect. This transmission is initiated by Google's code and concurrent with communications with

[29] https://www.emarketer.com/topics/category/google.

the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and run Defendant's website—Defendant's own code, and Google's embedded code.

80. As evinced through network traffic, Defendant assists Google with intercepting the content of electronic communications that reveal protected health information, including: 1) fullstring URLs; 2) information revealing the text of buttons that patients clicked; and 3) information revealing medicinal products that patients browsed, added to their cart, or purchased.

81. Defendant fails to obtain consent from its patients regarding these disclosures.

//

//

//

//

//

//

//

//

//

//

//

//

//

82. When a consumer visits the Website, they are prompted to choose their location. *See* Fig. 2. Once a consumer selects a location (Fort Lauderdale, for example), Defendant discloses that information to Google. *See* Fig. 3.




Figure 2

<table>
<tr><td>v</td><td>2</td></tr>
<tr><td>tid</td><td>G-Q7469BDQNE</td></tr>
<tr><td>gtm</td><td>45je5ca1v9204063716za200zd9204063716</td></tr>
<tr><td>_p</td><td>1767202498069</td></tr>
<tr><td>gcd</td><td>13l3l3l3l1l1</td></tr>
<tr><td>npa</td><td>0</td></tr>
<tr><td>dma</td><td>0</td></tr>
<tr><td>cid</td><td>1148116451.1767201495</td></tr>
<tr><td>ul</td><td>en-us</td></tr>
<tr><td>sr</td><td>2560x1441</td></tr>
<tr><td>uaa</td><td>x86</td></tr>
<tr><td>uab</td><td>64</td></tr>
<tr><td>uafvl</td><td>Google%20Chrome;143.0.7499.109|Chromium;143.0.7499.109|Not%20A(Brand;24.0.0.0</td></tr>
<tr><td>uamb</td><td>0</td></tr>
<tr><td>uam</td><td></td></tr>
<tr><td>uap</td><td>Windows</td></tr>
<tr><td>uapv</td><td>19.0.0</td></tr>
<tr><td>uaw</td><td>0</td></tr>
<tr><td>are</td><td>1</td></tr>
<tr><td>frm</td><td>0</td></tr>
<tr><td>pscdl</td><td>noapi</td></tr>
<tr><td>_eu</td><td>AAAAAAQ</td></tr>
<tr><td>_s</td><td>1</td></tr>
<tr><td>tag_exp</td><td>103116026~103200004~104527906~104528500~104684208~104684211~105391252~115583767~115616985~115938466~115938468~116184927~116184929~116251938~116251940</td></tr>
<tr><td>sid</td><td>1767201495</td></tr>
<tr><td>sct</td><td>1</td></tr>
<tr><td>seg</td><td>1</td></tr>
<tr><td>dl</td><td>https://sunburn-ftl.dispensary.shop/med/menu</td></tr>
<tr><td>dr</td><td>https://www.sunburncannabis.com/</td></tr>
<tr><td>dt</td><td>Sunburn - Ft. Lauderdale | Fort Lauderdale, FL</td></tr>
<tr><td>en</td><td>page_view</td></tr>
<tr><td>_ee</td><td>1</td></tr>
<tr><td>tfd</td><td>4728</td></tr>
</table>

Figure 3

83. Next, consumers are brought to Defendant's online shop, where they can select products and add to their "bag." *See* Fig. 4. Once a consumer adds an item to their bag, such as "Dealer's Choice Banana OG – 3.5g Flower", for example, Defendant discloses the name of the product, its price, and the fact that it was added to the consumer's bag to Google. *See* Fig. 5.




Figure 4

| | |
|---|---|
| v | 2 |
| tid | G-Q7469BDQNE |
| gtm | 45je5ca1v9204063716za200zd9204063716 |
| _p | 1767202498069 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1148116451.1767201495 |
| ul | en-us |
| sr | 2560x1441 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;143.0.7499.109\|Chromium;143.0.7499.109\|Not%20A(Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 4 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~105391252~115583767~115616985~115938466~115938468~116184927~116184929~116251938~116251940 |
| cu | USD |
| sid | 1767201495 |
| sct | 1 |
| seg | 1 |
| dl | https://sunburn-ftl.dispensary.shop/med/menu |
| dr | https://www.sunburncannabis.com/ |
| dt | Sunburn - Ft. Lauderdale \| Fort Lauderdale, FL |
| en | add_to_cart |
| _c | 1 |
| _ee | 1 |
| pr1 | id6e753469-eb5a-4dff-a042-fcbea798d104~nm3.5g Flower - Dealer's Choice~vaBanana OG~qt1~caFlower~brDealer's Choice~pr30 |
| epn.value | 30 |
| _et | 2309 |
| tfd | 1050896 |

Product Name

Product Price

Figure 5

84. Next, a consumer can view their "bag" prior to checkout. *See* Fig. 6. When a consumer clicks on "view bag" Defendant discloses that information to Google. *See* Fig. 7.




Figure 6

| | |
|---|---|
| v | 2 |
| tid | G-Q7469BDQNE |
| gtm | 45je5ca1v9204063716za200zd9204063716 |
| _p | 1767202498069 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1148116451.1767201495 |
| ul | en-us |
| sr | 2560x1441 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;143.0.7499.109\|Chromium;143.0.7499.109\|Not%20A(Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 12 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~105391252~115583767~115616985~115938466~115938468~116184927~116184929~116251938~116251940 |
| cu | USD |
| sid | 1767201495 |
| sct | 1 |
| seg | 1 |
| dl | https://sunburn-ftl.dispensary.shop/med/cart/view |
| dr | https://sunburn-ftl.dispensary.shop/med/cart/view |
| dt | |
| en | view_cart |
| _ee | 1 |
| pr1 | id6e753469-eb5a-4dff-a042-fcbea798d104~nm3.5g Flower - Dealer's Choice~vaBanana OG~qt1~caFlower~brDealer's Choice~pr30 |
| epn.value | 30 |
| _et | 6009 |
| tfd | 2548907 |

Figure 7

85. After viewing their "bag", consumers are prompted to checkout. *See* Fig. 8. Once a consumer clicks the checkout button, Defendant discloses this information to Google. Fig. 9.




Figure 8

| | |
|---|---|
| v | 2 |
| tid | G-Q7469BDQNE |
| gtm | 45je5ca1v9204063716za200zd9204063716 |
| _p | 1767202498069 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1148116451.1767201495 |
| ul | en-us |
| sr | 2560x1441 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;143.0.7499.109\|Chromium;143.0.7499.109\|Not%20A(Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 17 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~105391252~115583767~115616985~115938466~115938468~116184927~116184929~116251938~116251940 |
| cu | USD |
| sid | 1767201495 |
| sct | 1 |
| seg | 1 |
| dl | https://sunburn-ftl.dispensary.shop/med/cart/view |
| dr | https://sunburn-ftl.dispensary.shop/med/menu |
| dt | |
| en | begin_checkout |
| _ee | 1 |
| pr1 | id6e753469-eb5a-4dff-a042-fcbea798d104~nm3.5g Flower - Dealer's Choice~vaBanana OG~qt1~caFlower~brDealer's Choice~pr30 |
| epn.value | 30 |
| _et | 11823 |
| tfd | 3002998 |

Figure 9




Figure 10

86. On the checkout page, consumers are prompted to fill out a form with their personal information. *See* Fig. 10. Once a consumer begins filling out the form, Defendant discloses that information to Google. *See* Fig. 11. Once finished, consumers click the "place order" button; this information is also disclosed to Google. *See* Fig. 12.

<table>
<tr><td>v</td><td>2</td></tr>
<tr><td>tid</td><td>G-Q7469BDQNE</td></tr>
<tr><td>gtm</td><td>45je5ca1v9204063716za200zd9204063716</td></tr>
<tr><td>_p</td><td>1767202498069</td></tr>
<tr><td>gcd</td><td>13l3l3l3l1l1</td></tr>
<tr><td>npa</td><td>0</td></tr>
<tr><td>dma</td><td>0</td></tr>
<tr><td>cid</td><td>1148116451.1767201495</td></tr>
<tr><td>ul</td><td>en-us</td></tr>
<tr><td>sr</td><td>2560x1441</td></tr>
<tr><td>uaa</td><td>x86</td></tr>
<tr><td>uab</td><td>64</td></tr>
<tr><td>uafvl</td><td>Google%20Chrome;143.0.7499.109|Chromium;143.0.7499.109|Not%20A(Brand;24.0.0.0</td></tr>
<tr><td>uamb</td><td>0</td></tr>
<tr><td>uam</td><td></td></tr>
<tr><td>uap</td><td>Windows</td></tr>
<tr><td>uapv</td><td>19.0.0</td></tr>
<tr><td>uaw</td><td>0</td></tr>
<tr><td>are</td><td>1</td></tr>
<tr><td>frm</td><td>0</td></tr>
<tr><td>pscdl</td><td>noapi</td></tr>
<tr><td>_eu</td><td>AEEAAAQ</td></tr>
<tr><td>_s</td><td>19</td></tr>
<tr><td>tag_exp</td><td>103116026~103200004~104527906~104528500~104684208~104684211~105391252~115583767~115616985~115938466~115938468~116184927~116184929~116251938~116251940</td></tr>
<tr><td>sid</td><td>1767201495</td></tr>
<tr><td>sct</td><td>1</td></tr>
<tr><td>seg</td><td>1</td></tr>
<tr><td>dl</td><td>https://sunburn-ftl.dispensary.shop/med/cart/checkout</td></tr>
<tr><td>dr</td><td>https://sunburn-ftl.dispensary.shop/med/cart/view</td></tr>
<tr><td>dt</td><td></td></tr>
<tr><td>en</td><td>form_start</td></tr>
<tr><td>ep.form_id</td><td></td></tr>
<tr><td>ep.form_name</td><td></td></tr>
<tr><td>ep.form_destination</td><td>https://sunburn-ftl.dispensary.shop/med/cart/checkout</td></tr>
<tr><td>epn.form_length</td><td>14</td></tr>
<tr><td>ep.first_field_id</td><td>birth_date</td></tr>
<tr><td>ep.first_field_name</td><td>birth_date</td></tr>
<tr><td>ep.first_field_type</td><td>date</td></tr>
<tr><td>epn.first_field_position</td><td>8</td></tr>
<tr><td>_et</td><td>7406</td></tr>
<tr><td>tfd</td><td>3031579</td></tr>
</table>

Figure 11

//

//

//

//

//

| | |
|---|---|
| v | 2 |
| tid | G-Q7469BDQNE |
| gtm | 45je5ca1v9204063716za200zd9204063716 |
| _p | 1767202498069 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1148116451.1767201495 |
| ul | en-us |
| sr | 2560x1441 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;143.0.7499.109\|Chromium;143.0.7499.109\|Not%20A(Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 21 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~105391252~115583767~115616985~115938466~115938468~116184927~116184929~116251938~116251940 |
| cu | USD |
| sid | 1767201495 |
| sct | 1 |
| seg | 1 |
| dl | https://sunburn-ftl.dispensary.shop/med/order/confirmation?orderId=1d7e52e8-d6d6-40e9-9393-43b499adb54f |
| dr | https://sunburn-ftl.dispensary.shop/med/cart/view |
| dt | |
| en | purchase |
| _c | 1 |
| _ee | 1 |
| pr1 | id6e753469-eb5a-4dff-a042-fcbea798d104~nm3.5g Flower - Dealer's Choice~vaBanana OG~qt1~caFlower~brDealer's Choice~pr30 |
| ep.transaction_id | 1d7e52e8-d6d6-40e9-9393-43b499adb54f |
| epn.value | 30 |
| epn.tax | 0 |
| _et | 1647 |
| tfd | 3810209 |

Figure 12

87. The information disclosed to Google by Defendant allows Google to discern the identities of specific individuals in addition to learning the details of their purchase. Both Google and Defendant profit by using the intercepted data for targeted advertising purposes.

88. Defendant further discloses to Google the PII of their patients' sufficient for Google to uncover their identities. In the HTTP communications shown in the Figures above, the patients' IP address is inherently included in every network request. In addition to their patients' IP address, Defendant, through Google's tracking technology, disclosed information about consumer devices

and user-IDs ("cid") to Google, allowing Google to link such information to an individual's specific identity.

89. As shown in the Figures above, and described throughout this Complaint, Plaintiff's communications with Defendant were disclosed by Defendant to Google and/or intercepted in transit by Google, in real time, via detailed URLs, which contain the medically sensitive information entered into the Website.

90. Defendant also uses and causes the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual medical marijuana purchases.

91. Defendant sent out these identifiers (e.g. cid, IP address, and device information) with each patient's "event" data.

92. The information shared by Defendant with Google allows Google to discern identities of specific individuals and associates this information with their purchase details.

93. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to intercept and disclose his confidential information to unknown third parties.

94. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to share his confidential health information. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

95. By law, Plaintiff is entitled to privacy in his protected health information and confidential communications. Defendant deprived Plaintiff of his privacy rights when it implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

### F. Defendant's Conduct Caused Economic Injury

96. Plaintiff's and Class members' online activity—including the browsing history and purchase history generated by navigating Defendant's website—has financial value. As a leading expert in data privacy, Professor Paul Schwartz at UC Berkeley, explained in an article published by the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[30]

97. Numerous studies support Professor Schwartz's conclusion. In one such study, for example, researchers studied the value that 180 consumers placed on keeping personal data secure. As relevant here, consumers valued contact information at approximately $4.20 per year; they valued their online purchase history at $5.70 per year; and they valued their browsing history at $52 per year.[31]

98. Moreover, numerous companies offer products through which consumers can receive payment in exchange for a license to track their data. Meta Platforms, Inc., for example, ran a "Facebook Research" app in 2019 through which it paid $20 for a license to collect browsing history and other communications from consumers between the ages of 13 and 35.[32]

99. There also exists an illicit marketplace for protected health records. Indeed, "[h]ealth records are highly coveted on the black market due to the wealth of personal information

---

[30] Paul M. Schwartz, Property, Privacy, and Personal Data, 117 HARV. L. REV. 2055, 2056 (2005).

[31] Tim Morey, What's Your Personal Data Worth?, DESIGN MIND (Jan. 18, 2011).

[32] Josh Constine, Facebook pays teens to install VPN that spies on them, TECHCRUNCH (Jan. 29, 2019), available at https://techcrunch.com/2019/01/29/facebook-project-atlas/.

they contain," selling anywhere from $60 to "upwards of $1,000."[33] "Beyond illicit markets, health data [also] holds substantial economic value for legitimate organizations."[34]

100. Defendant's conduct caused third parties—like Google—to profit from Plaintiff's and Class members' personal information and their activity on Defendant's website. Directly and indirectly, for example, Defendant paid these third parties to collect and analyze that information so Defendant could better target advertisements and marketing materials.

101. Put another way, Defendant and other companies paid the third parties here— like Google—for services and products that relied on analyzing or otherwise exploiting Plaintiff's and Class members' personal information and their activity on Defendant's website without any renumeration to the Plaintiff or Class members.

102. Because Florida law recognizes a legal interest in unjustly earned profits, Plaintiff and Class members have an entitlement to profits earned from their personal data.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

103. The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.

104. Defendant has never disclosed that it would or could disregard those representations and instead helps third parties intercept communications containing customers' personally identifiable information. Defendant affirmatively hid its true actions and knowingly made statements that were misleading and concealed the true nature of its conduct and operation. The circumstances of third-party trackers employed on and with respect to Defendant's website would

---

[33] https://www.forbes.com/sites/chrissamcfarlane/2025/03/29/the-wake-up-call-your-health-data-is-at-risk/.

[34] *Id.*

lead reasonable users to believe third parties were not collecting their personally identifiable information or that Defendant was facilitating disclosure of the same.

105. Moreover, Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his own part.

106. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiff. Defendant therefore is estopped from relying on any statute of limitations.

107. All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiff and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

108. Accordingly, Plaintiff and the Class could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## CLASS ALLEGATIONS

109. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

**Nationwide Class:** All natural persons in the United States who, during the Class Period, purchased medical marijuana on the Website.

**Florida Subclass:** All natural persons in the State of Florida who, during the Class Period, purchased medical marijuana on the Website.

110. Excluded from the Classes are Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or has had a controlling interest.

111. Plaintiff is a member of the Classes he seeks to represent.

112. The Classes are ascertainable because the Class Members can be identified by objective criteria – all individuals who accessed the website, www.sunburncannabis.com to purchase medical marijuana. Individual notice can be provided to Class Members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

113. **Numerosity.** The Classes are so numerous that joinder of all members is impractical. Although Plaintiff does not yet know the exact size of the Classes, it is believed that there are at least thousands of Class Members.

114. **Commonality.** There are numerous questions of law and fact common to the Classes, which predominate over any individual actions or issues, including but not limited to:

a. Whether Defendant gave the Class Members a reasonable expectation of privacy that their information was not being shared with third parties;

b. Whether Defendant's disclosure of information constitutes a violation of the claims asserted;

c. Whether Plaintiff and Class Members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

d. Whether Plaintiff and Class Members have sustained damages as a result of Defendant's conduct and if so, what is the appropriate measure of damages or restitution.

115. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Classes, as all members are similarly affected by Defendant's wrongful conduct. Plaintiff has no interests antagonistic to the interests of the other members of the Classes. Plaintiff and all members

of the Classes have sustained economic injury arising out of Defendant's violations of law as alleged herein.

116. **Adequacy.** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiff and his counsel.

117. **Superiority.** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of liability issues will ensure that all claims are consistently adjudicated.

118. Plaintiff reserves the right to revise his allegations and class definition based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

**COUNT I**
**Violation of the Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2511(1) *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

119. Plaintiff repeats the allegations contained in paragraphs 1 through 118 as if fully set forth herein.

120. Plaintiff brings this Count individually and on behalf of the members of the Class.

121. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

122. The ECPA protects both the sending and the receipt of communications.

123. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

124. The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

125. The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

126. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

127. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

128. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

129. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant and Google used to track Plaintiff and Class Members communications while they were navigating the Website;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' mobile devices;

d. Defendant's and Google's web and ad servers;

e. The plan Defendant, and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

130. Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

131. When a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to third parties at the same time as they are being sent to Defendant.

132. By utilizing and embedding the tracking technology provided by Google on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

133. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by Google on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI.

134. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including their identities and information related to the medical purchases they made. This confidential information is then monetized for targeted advertising purposes, among other things.

135. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

136. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

137. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

138. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Health

Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[35]

139. The information that Defendant disclosed to Google qualifies as IIHI and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct also constitutes as tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used electronic communications to increase its profit margins. Defendant specifically used the tracking technology provided by Google to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

140. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

141. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to Google without their knowledge or consent.

142. The foregoing acts and omissions therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

[35] 42 U.S.C. § 1320d-6.

143. As a result of each violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq*. under 18 U.S.C. § 2520.

**COUNT II**
**Violation of Florida's Security of Communications Act ("FSCA")**
**Fla. Stat. § 934.01**
**(On Behalf of Plaintiff and the Florida Subclass)**

144. Plaintiff repeats the allegations contained in paragraphs 1 through 118 as if fully set forth herein.

145. Plaintiff brings this claim individually and on behalf of the members of the putative class against Defendant.

146. Florida's Security of Communications Act ("FSCA") prohibits "[i]ntentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept any wire, oral, or electronic communication." Fla. Stat. § 934.03(1)(a).

147. The FSCA similarly prohibits "disclos[ing], or endeavor[ing] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." *See* Fla. Stat. § 934.03(1)(c).

148. The FSCA also prohibits "[i]ntentionally us[ing], or endeavor[ing] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." *See* Fla. Stat. § 934.03(1)(d).

149. Defendant violated the FSCA by procuring third parties—including but not limited to Google—with intercepting the content of electronic communications, including those that contained protected health information and personally identifiable information.

150. Defendant violated the FSCA by employing tracking technology to disclose the contents of electronic communications, including those that contained protected health information and personally identifiable information.

151. Defendant violated the FSCA by using the contents of electronic communications to run marketing and advertising campaigns, including communications that contained protected health information and personally identifiable information.

152. By knowingly integrating code into its website, Defendant intentionally caused third parties—including but not limited to Google—to intercept and receive electronic communications. The interceptions were done contemporaneously with Plaintiff's and Class members' sending and receiving communications. The intercepted communications included the "contents" of electronic communications.

153. The transmission of data between Plaintiff and Defendant constitute "transfer[s] of signs, signals, writing, … data, [and] intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of Fla. Stat. § 934.02(1)(12).

154. The following constitute "devices" within the meaning of Fla. Stat. § 934.02(1)(4):

a. The computer codes and programs used by third parties— including but not limited to Google—to track Plaintiff's and Class members' communications while they were navigating Defendant's website;

b. Plaintiff's and Class members' browsers or mobile applications;

c. Plaintiff's and Class members' computing and mobile devices;

d. The web and ad servers of third parties, including but not limited to Google;

e. The web and ad-servers from which third parties—including but not limited to Google—tracked and intercepted Plaintiff's and Class members' communications while they were using a web browser or mobile application to navigate Defendant's website;

f. The computer codes and programs used by third parties— including but not limited to Google—to effectuate their tracking and intercepting of Plaintiff's and Class members' communications while they were navigating Defendant's website; and

g. The plan that third parties—including but not limited to Google—carried out to effectuate their tracking and intercepting of Plaintiff's and Class members' electronic communications.

155. Plaintiff and Class members were unaware that third parties—including but not limited to Google—were receiving: 1) form field entries; 2) full-string URLs; 3) information revealing the text of buttons clicked; and 4) information revealing the products that patients browsed, added to cart, and purchased.

156. Plaintiff and Class members never provided Defendant or the third parties—including but not limited to Google—with consent to intercept or collect their electronic communications.

157. As a result of the above actions and pursuant to Fla. Stat. § 934.10, the Court may award statutory damages to Plaintiff and Class members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably incurred.

**COUNT III**
**Civil Theft**
**Fla. Stat. § 772.11**
**(On Behalf of Plaintiff and the Florida Subclass)**

158. Plaintiff repeats the allegations contained in the paragraphs 1 through 118 as if fully set forth herein.

159. Plaintiff brings this Count individually and on behalf of the members of the putative Class.

160. Florida law provides that "[a] person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or use, the property of another with intent to, either temporarily or permanently: (a) [d]eprive the other person of a right to the property or a benefit from the property; (b) [a]ppropriate the property to his or her own use or to the use of any person not entitled to the use of the property." *See* Fla. Stat. § 812.014. Florida law also provides that "both the actor and one who aids and abets him are principals in the first degree and may be charged and convicted of the crime." *Chudoin v. State*, 362 So. 2d 398, 401 (Fla. 2d DCA 1978).

161. The phrase "obtains or uses" means:

a. control over property."

b. "Making any unauthorized use, disposition, or transfer of property."

c. "Obtaining property by fraud, willful misrepresentation of a future act, or false promise."

d. "Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception."

e. "Other conduct similar in nature." *See* Fla. Stat. § 812.012(3).

162. The term "property" means "anything of value." *See* Fla. Stat. § 812.012(4). This includes:

a. "Real property, including things growing on affixed to, and found on land."

b. "Tangible or intangible personal property, including rights, privileges, interests, and claims."

c. "Services." *Id.*

163. The phrase "property of another" means "property in which a person has an interest upon which another person is not privileged to infringe without consent, whether or not the other person also has an interest in the property." *See* Fla. Stat. § 812.012(5).

164. Plaintiff's and Class members' information—including but not limited to their health information, personally identifiable information, and online activity—has pecuniary value.

165. The third parties effectively charged Plaintiff and Class members by using their valuable personal information and protected health information without permission and exploiting such information for financial benefit. Plaintiff and Class members retain a stake in the profits that Defendant and third parties earned from their personal information and other data because, under the circumstances, it is unjust for Defendant and the third parties to retain those profits.

166. As reflected by both federal and state law, Plaintiff and Class members have an interest in their health information, personally identifiable information, and online activity upon which third parties—including but not limited to Google— were not privileged to infringe without consent. *See, e.g.*, 45 CFR § 164.508; Fla. Stat. § 381.986(10)(f)(4); Fla. Stat. § 817.5685(1); Fla. Stat. § 817.568(2)(a).

167. By integrating the tracking technology into its website, Defendant knowingly aided and abetted third parties—including but not limited to Google—with appropriating Plaintiff's and

Class members' protected health information, personally identifiable information, and online activity.

168. Plaintiff and Class members never provided the third parties with consent to use their health information, personally identifiable information, and online activity.

169. As a result of the above actions and pursuant to Fla. Stat. § 772.11, the Court may award statutory damages to Plaintiff and Class members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably incurred.

**COUNT IV**
**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. § 501.204, *et. seq.***
**(On Behalf of Plaintiff and the Florida Subclass)**

170. Plaintiff repeats the allegations contained in paragraphs 1 through 118 as if fully set forth herein.

171. Plaintiff is a "consumer" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7), in that Plaintiff is an individual who purchased, or sought to purchase, and/or used Defendant's goods and services primarily for personal, family, or household purposes.

172. Florida law provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *See* Fla. Stat. § 501.204(1).

173. An "unfair practice" is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

174. A "deceptive practice" is one that is likely to mislead consumers.

175. In enacting FDUTPA, the Legislature expressed its intent that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), as of July 1, 2017. *See* Fla. Stat. § 501.204(2).

176. The FTC has made clear that "disclosing consumers' health information for advertising without their affirmative express may be an unfair practice."[36]

177. Under federal and state laws, Defendant was obligated to protect Plaintiff's and Class members' information—including but not limited to their health information, personally identifiable information, and online activity—from disclosure. *See, e.g.*, 45 CFR § 164.508; Fla. Stat. § 381.986(10)(f)(4); Fla. Stat. § 817.5685(1); Fla. Stat. § 817.568(2)(a).

178. Defendant engaged in unfair and deceptive practices by integrating tracking technology into its website that disclosed Plaintiff's and Class members' information—including their health information, personally identifiable information, and online activity—to Google.

179. By integrating tracking technology into its website, Defendant received unjust enrichment and caused third parties to intrude upon Plaintiff's and Class members' seclusion. Defendant's misconduct thus caused Plaintiff and Class members to suffer actual damages.

180. As a result of the above actions and pursuant to Fla. Stat. § 501.211, the Court may award actual damages to Plaintiff and Class members; injunctive and declaratory relief; and reasonable attorney's fees.

---

[36] https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach

**COUNT V**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Florida Subclass)**

181. Plaintiff repeats the allegations contained in paragraphs 1 through 118 as if fully set forth herein.

182. As described herein, Defendant aided and abetted third parties with intruding upon the following legally protected privacy interests:

a. The Wiretap Act as alleged herein;

b. Florida's Security of Communications Act as alleged herein;

c. Statutory and regulatory protections for protected health information and personally identifiable information as alleged herein;

183. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiff and Class members could not reasonably expect Defendant would commit acts in violation of federal and state civil and criminal law.

184. Defendant's actions and the third parties' actions constitute a serious invasion of privacy in that such actions:

a. Violated several criminal laws, including the Wiretap Act;

b. Invaded the privacy rights of millions of Americans (including Plaintiff and Class members) without their consent; and

c. Constituted the unauthorized taking of valuable information from millions of Americans through deceit.

185. Committing criminal acts against thousands of Americans constitutes an egregious breach of social norms that is highly offensive.

186. The surreptitious and unauthorized tracking of the internet communications of millions of Americans—particularly where, as here, such communications are sensitive and confidential—constitutes an egregious breach of social norms that is highly offensive.

187. The disclosure of personally identifiable information of millions of Americans through deceit is highly offensive behavior.

188. Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation and injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. Determining that this action is a proper class action;

b. For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorney(s) as Class Counsel to represent the Classes;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the Classes on the counts asserted herein;

e. Awarding compensatory damages, including statutory damages where available, to Plaintiff and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. Ordering Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

k. Granting Plaintiff and Class Members such further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated: April 10, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *___/s/ Sarah N. Westcot___*
Sarah N. Westcot

Sarah N. Westcot (State Bar No. 1018272)
Stephen A. Beck (State Bar No. 1010183)
Kevin A. Kapral (State Bar No. 1068669)
701 Brickell Ave., Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-mail: swestcot@bursor.com
sbeck@bursor.com
kkapral@bursor.com

*Counsel for Plaintiff*